Mr. Ellis, I need to ask you a question before you get started, okay? You both filed proposed bystander's reports, and you noticed one for hearing before the judge. And that was set for a date, I can tell from the record. And then someone filed in the appellate court the Appalee's proposed bystander's report with an attached blank order not signed by the judge. The record in this case does not have a signed order certifying any bystander's record. Did the judge certify one? I believe he did, Judge. I was not aware that he had not signed it, but there was an agreement as to what the bystander report would be. And I think that we both worked out, in any given instance, that. There's nothing in the record. The Supreme Court rule 323C requires that the court hold a hearing and certify and order the filing of an accurate report of proceedings to a bystander's report. In the absence of that, there is no record of what transpired at that hearing. So you're telling me you don't know whether the judge ever certified the bystander's report? I don't believe if it's not part of what the court said. I guess I would say that he orally agreed that this would be the bystander record without signing it. I mean, the rule does provide for an agreed statement of facts, but there's no agreed statement of facts filed in this case. There's two separate bystander's reports. Right. So here's the question. If we have no report of proceedings in the record, how can we ever find that what the trial judge did was against the manifest weight of the evidence? That's a very good question, Judge. I don't really have an answer. Okay. Sorry to start you off here this way, but I've looked at the record. There's no certified bystander's report. Right. Well, I would say that. I mean, if one was signed back at a prior time and just isn't in the record, then somebody needs to file a motion to supplement the record or something. But as the record sits right now, there is no report of proceedings of the hearing. Well, if I may, Judge, I would say that we did reach an agreement on the date of the hearing as to what the facts would state. And I think that is part of the record, the one that was signed by the Apolis attorneys' briefs. There's nothing in the record to show there was any agreement. Yes, Judge. And I guess my understanding is the judge was going to sign that certification, and I guess he never did. I don't know. But I wanted to ask you right off the bat. If there was something out there that didn't get in the record that we need, I wanted to find out. So, all right, go ahead. Well, in that case, I suppose I would, as far, leave to file a motion to supplement the record with a motion saying that we reached that agreement in front of. Well, you can file whatever you want to file, but, you know, I mean, if. It might be too late. Well, we're not ruling on anything right now, but. I suggest you do that and let us at least consider it. Okay. Thank you. Good morning. May it please the court. Counsel. My name is Jim Ellis, and I am the attorney for the appellants, William Scott Eaker and Kathleen Gonzales Eaker. These two cases have been consolidated. I assume that the justices have read the briefs. So I will only briefly touch on what I consider to be the most relevant parts of the history of this case. And then I will make two arguments. First, that there was insufficient evidence to grant the motion or the petition for the stalking order. And second, that the standard should be a combination of a subjective plus an objective standard. This case starts on October 3rd. It's a Sunday. The appellant, Scott Eaker, called the police because his father and his uncle were getting into an argument. The argument was becoming heated. It was escalating. Scott Eaker called the police to keep the peace. Now, this argument was over 100 yards away from the appellee's home. The very next day, she files her petition, and the first thing she mentions in her petition is this sentence. She says that when she got home from work, she saw a sign that said that her fence was going to be taken down because there was an ongoing property line dispute. Eakers feel that a portion of her fence encroaches upon their property, and there's been some surveys done in that regard. The sign also said that if she removed the sign, the police would be called because there was a history of her taking down no trespassing signs that the Eakers had put up. She admitted to that report. And she said in her petition that the police showed up with guns. She said that the guns scared her, so she files a petition against my clients who did not have guns and who were not involved in the incident. They were merely trespassing. There was a lock that was from the gate by Kathleen Eaker, a gate that separated. The gate was in the middle of a chain link fence between the two parties' properties. She put a lock on the gate and put superglue in the lock so that it would remain permanently closed so that no one could get through. Kathleen Eaker attached chicken wire on the fence that separated the properties so her dogs could not get out of her backyard. And that was cut by the petitioner. The zip tie that was holding the chicken wire to the fence was cut, and the chicken wire was tossed into the yard of Scott and Kathleen Eaker. That caused an injury to my client's son and to one of their pets. There were several no trespassing signs which were put up by my clients all over the property. And maybe the most important fact is that my clients, Scott and Kathleen Eaker, actually moved out of their home to a home that was owned by Scott's father, which was nearby, to get away from him, to get away from the petitioner. Because after the injury to their son and to their dog, they felt like she was dangerous to them. The crux of this case comes down to the ongoing dispute between two neighbors. It is a very far cry from an issue of stalking. In this case, Judge Jensen held up a photograph of a no trespassing sign that had been painted on the side of a Daryl truck that had been parked in their backyard and said no trespassing. The judge held up the photo and said no one can convince me that this is not harassment. Is that all it said was no trespassing? To my recollection, yes. But a no trespassing sign is the absolute antithesis of stalking. Stalking is trying to force yourself into someone else's life against their wishes. A no trespassing sign is saying leave me alone. Don't come on my property unless you're invited. Stay away from me. That's what a no trespassing sign communicates. Hypothetically, in the right kind of situation, I think that a no trespassing sign or saying stay off my property could be used as harassment. Say if they had gone to her place of employment and made a huge scene. If they had taken out a billboard or hired a skywriter so that everyone would see this. Then, yeah, I could say, well, that's obviously not what they're communicating. They're trying to embarrass this person. But that's not what we have here. The stalking no contact order requires that the person have a fear of what their alleged stalker is doing or causes emotional distress. I cannot agree respectfully with Judge Jensen that putting up a no trespassing sign would ever cause anyone fear or emotional distress. But even if that were the case, it still cannot be part of the foundation for stalking because it is protected free speech. First, there aren't many cases that deal with no trespassing and the issue of free speech. In fact, I did a rather extensive search. I could only find one case in the country that ruled on that specific issue. It was a case I cited in my brief, Dolecki. It's out of New Jersey. And that case did hold that a no trespassing sign is protected under the First Amendment as free speech. So under the statute, free speech, anything that would be considered free speech, is exempted from forming the basis for a stalking no contact order. So even if somehow someone said no stalking causes me fear, it still can't be part of the statute. It still can't be something that can form the basis. Mr. Ellis, where do these folks live? Is it in a rural area? Yes, they live... Actually, the Ekers property is in unincorporated Madison County. However, Kimbrough Carriker's property used to be unincorporated. It is my understanding that the city of Troy annexed it because her father lived there and he wanted to be mayor. But is it like farm ground, rural ground? They're not in a neighborhood anywhere, are they? Yes, it's more akin to farm ground. The property where the argument occurred on was a farm that is over 30 acres large. And how close was the car to the fence that divided the property? I don't know that. The Ekers backyard on Center Street is not a huge yard. That's not a farm. That's a normal subdivision sized lot, I would say. So they do live in a subdivision? I think that there's, on Center Street, I think there's four houses, three or four houses. I've been there. I mean, is this a situation where the neighbors, like you suggested, where the neighbors know what's going on? This is obviously a neighborhood feud. Yes, it's a neighborhood feud, exactly. And do the neighbors know what's going on? I don't know. Are they close enough that they can see this stuff going on back and forth, painting the car and hanging deer in the backyard or whatever? Right. There was testimony about that from both sides. Kimbrough said that it could be seen by people from the road. She lives at the end of a dead-end street, however, and my client said, no, that wasn't possible, that the only person that could see that would have been her. So it wasn't something that was put out for publication to the world at large. Do you think that harassment is the same as stalking? I think in some situations it could be. I think that harassment by itself is not the same as stalking. I think that harassment can form a part of a stalking relationship. Because didn't Judge Jensen say, he held up his photograph and said, no, this is harassment. Yes. He said, no one can convince me this is not harassment. Yes. I think that if a stalker wanted to harass his stalking victim, they could do that sort of thing. They could try to harass them. But I don't believe that it's an equivalency, that stalking equals harassment. Because I think that there are situations where people are harassed, and it does not equal stalking. And that's the problem here. Well, that's not the only incident upon which Judge Jensen based his order, right? I mean, there was testimony about she, petitioner testified they watched her, you know, et cetera. And in his written order, he made a finding that says petitioner is a victim of two or more acts of following, monitoring, observing, surveilling, threatening, communicating, or interfering, or damaging to property or pets by respondent. Two or more acts that fit in those categories, that's what the statute says, right? Yes. And we can talk about harassment or stalking or whatever all we want, but the stalking statute defines, you know, what it takes. Yes. For this order to be entered, and Judge Jensen made that finding. He didn't specify out of the testimony specifically which ones. I mean, you want to point to him holding up the photograph. You know, he did do that, you know, evidently. But, you know, there were evidently, there was evidently other evidence in addition to that because he had to find two or more acts. Yes. Yes. There was other evidence. The reason for the focus on that is that was the only indication that we had of the thing that he found. If there were, of the other evidence, if he found one part of the evidence compelling and another part not compelling, that is something that because he did not specify in his order or orally from the bench, we don't know. It's a form order for the statute. Exactly. That's exactly right. Yes. Yes. But the evidence that was presented, I think, is indicative not of stalking but of neighbors who don't get along. There was mention of a lock that was found on the gate. That was done by Kathleen Eaker. And she had said that that was done at the suggestion of Judge Bailey after they had sought a stalking no contact order against Kimber's boyfriend from an earlier claim. That is part of the motion to supplement the record that I had previously filed. That was not introduced at the trial court, right? It was not. There was testimony, Your Honor, there was testimony about what Judge Jensen ruled. Judge Bailey. I'm sorry. You're correct. Judge Bailey, not Judge Jensen. Both sides tried to recall precisely what he had said. And so the transcript itself had not been entered. That is correct. But there was a discussion apparently after that hearing. Kathleen Eaker had said that he had made a recommendation, I suspect somewhat off the cuff, saying don't go around the person. Why don't you put a lock on the gate so that you don't have to worry about trespassers coming in on your property, which had been issued previously. So that's what she did. Kimber cuts the lock off the gate. And then it's not that she objects to a lock being on a gate because she follows that up by putting her own ad lock on that very same gate. So that action of destroying the property is much more consistent with the person that would be doing something that could be considered stoning, the property damage. The same with the cutting of the zip ties and then throwing the chicken wire in the yard, injuring their son and one of their pets. Now, I'm not suggesting that the petitioner was actually stalking. I'm saying that there's a compelling case. But here's the problem. In a situation where you've got neighbors who are feuding, this particular law could be used to evict your neighbor. So imagine a person moves into a neighborhood and they don't like their neighbor for whatever reason. Maybe it's a person who they find a little creepy, they watch a lot of people, but that's just their personality. Well, they're already 50% or halfway there to having a device that can evict their neighbor because they don't like them. That's not what the stalking statute should be for. To paraphrase the Missouri case, CH v. Wolf, a stalking order shouldn't be a panacea to solve all issues between neighbors who don't get along. But that's what we have. My second point involves what standards should be applied. And I think that the statute clearly says that it should be an objective standard. I believe that the opposing counsel suggested that perhaps it should be a subjective standard. I don't think that's possible. I think the statute requires an objective standard, but I don't think it limits it to that. I think what makes more sense is that there should be a combination of subjective and objective. In other words, the petitioner should say, these things either cause me fear or emotional distress. And then the court should look at that and decide whether or not that testimony is something that society should consider as reasonable. The courts do this very same thing when they look at probable cause when someone says their Fourth Amendment rights were violated in a criminal case. They say they have an expectation of privacy. That's the subjective part. Then they say, and I think that expectation of privacy is reasonable. If they convince the court of that, then they agree. Mr. Ellis, I want to ask you a question about the FOID card. What's the status of that? My client is still deprived, even though the court order specifically said that he could have his – this should not affect his FOID card. The Illinois State Police treats the entry of the order as – and I think they may be doing this pursuant to perhaps a federal statute that was referenced in one of the Missouri cases. Go ahead, you may answer. Thank you. He's still barred from possessing any guns and does not have them. Okay. Thank you. Thank you. Mr. Williams? Mr. Williams? Let this court – this case, there was evidence placed in the record. I know that there's a question about that bystander's report. And a stalking no-contact order was entered by Judge Jensen. The Ekers, however, are attempting to dismiss all of that evidence and testimony presented by Kimber Carriger stating that the only evidence that Kimber was alarmed was that the police showed up and that Scott Eker had previously been firing a rifle in his backyard. They're asking the court to ignore all of the other evidence and testimony and to look at all these other behaviors as unrelated, purely isolated events, and therefore there's no course of conduct by which Judge Jensen could have possibly found that there was any stalking or harassing behavior going on. When was Dale Walter made a protected person? He was named in the petition, Your Honor. Why? He lives with her at the property she lives in. Did he testify that he was in any fear? His testimony mostly mirrored Kimber's. I do not recall if he said he had fear or not. I just remember he was named on there, and when Judge Jensen told us to write up the order, we wrote it up that way. Does he have any ownership interest in the property? I do not know. I don't believe so. He just happens to live with this lady? Yes. For example, where they're saying it's isolated incidents, one of the things that the pellets and their brief is that the firing of the rifle was in the summer of 2012, and the police called precipitated, if you will. This petition was in October, and therefore, there couldn't be any relationship. That's just not convincing, because the way it's written up with a course of conduct, it connotes that there is a course of time, a time span going on. There's not anything in the statute that says these events must all take place within X time period or something. It's a pattern of behavior that goes on over a course of time. Let me indicate this pattern that went on. It was a long-term pattern, and finally, Kimber had reached a breaking point and filed this petition. The Ekers had placed a lock on Kimber's gate after they failed to prevail in court, trying to get a stalking no contact order against her boyfriend Dale Walter in September of 2011. Now, they tried to say that Judge Bailey told them to do this. However, in the evidence or in the supplement that Mr. Ellis filed with partial transcript of that hearing, there's no mention by Judge Bailey to either party to place a lock on the gate. And I don't believe that Judge Bailey would have the authority to say, you don't own this fence, but I want you to put a lock on this other person's property. So that lock had wrongfully been placed on my client's fence. Now, she didn't want that lock on there that the Ekers could open whenever they felt like it, come onto her property if they will, so she cut it off. It wasn't their right to put that lock on there. She did, however, put a lock of her own on it because it's her gate, and the way her fence sits, it doesn't sit right on the property line, it sits a little bit off the property line. So she can open the gate and walk out through it and still be on her property. However, when that lock was placed on there, the Ekers went and filled up a super loop so that she couldn't use her own gate. So this wasn't a matter of, we just want Ms. Character to leave us alone and Judge Bailey told us to put this lock on it and everybody's happy. No, we're not going to let you use your gate. I want to interrupt you one more time. After the order was entered by Judge Jensen, it seems that the parties went back and amended it. And why did that happen? Now people are being able to enter the property. It's not clear to me what's going on. Is everybody getting along? We were trying to be conciliatory because I guess part of, or one of the houses on the farm property was either not ready to be lived in or something. I don't remember the exact reason, but we were trying to be amicable in saying, look, we understand that you, because the Ekers had said that they had lived at this property. There was confusion as to where they actually lived. But we were trying to say, look, as long as you follow this order, we don't mind you being at home. We're not trying to kick you out. We just don't want you bothering us. So that was part of it. So they could go back home as long as they stayed 200 feet away from the Ekers. No, that was where we amended it. Because they couldn't go back home if they had to stay away from 200 feet or more. So we said, you can go to the home. Just don't come out to the backyard and bother us or harass the property and so forth. Well, that's what's not clear in this. It says you can build a privacy fence. I mean, it looks like you're working out the order. They were going to build a privacy fence. I believe it was completed at some point. So as of today, are your clients living where they live? And is Mr. Ellis' clients living where they live? I'm not sure exactly where Mr. Ellis' clients are living. There's been some contradictory statements as to where they're actually living, whether it's on Bliss Lane or in one of the two houses on Oak Ridge. I'm not sure. I'm just wondering about the last order filed on December 6, 2012, where you actually vacate the order or modify the order of November 1. The point where after constructing a privacy fence, it looks like everybody can go back to their homes. Is that the hand written over your eye? Yes, A-17. Part of the problem that occurred was this order was entered because of a couple problems. The original order was written up close to the end of the day, and the original order did not have a designation in it. So there was no, you know, how far do we have to stay away, et cetera. Now, my client went up the next day or so later and filed a pro se motion regarding that. Judge Bailey had entered an order with a footage figure, and then the order was vacated so that we could correct it. Now, by that point, this order was written up where they were allowed to enter that property, but they were going to put up a privacy fence so that they could continue to remain in that property versus being evicted from that one. Judge Bailey entered the pro tempore order? Judge Bailey entered it, and then that order was vacated when we, myself and Mr. Ellis, went in front of Judge Jensen later. That's December 6, 2012, right? Yes. So? So it vacated the November 5 order, which was the no pro tempore order, and then we modified the November 1 order where the original November 1 order did not have any footage statement in it. And so rather than saying you have to stay 200 feet away, we said, look, we'll let you live there under these conditions rather than having to be out today. They attached this green chicken wiry looking fence to my client's fencing. They wouldn't remove it, so eventually, yes, she cut the zip ties on it. However, the zip ties were saved. They were submitted into evidence later. There was no throwing of the wire into the yard. This was an uncoiled fencing, and when the zip ties were cut, the wire fencing, from what I understand, it ended up kind of coiling back on itself. There wasn't chopped up wire thrown to the fence, as Mr. Ellis' clients had suggested. The no trespassing signs, some of these were actually placed on my client's property because of the way her fencing was set. They set these signs right up against the fence. They also painted the side of a pickup truck with no trespassing in bold capital letters right next to her fence. There was a sign that said, we're going to be removing your fence. We're going to call the police if you remove the sign. That was actually placed on my client's property. Then there was the large piece of plywood that they placed right next to my client's house. It could be seen by anybody on the road or driving by or wherever. It said 11OP747 READED in all capital letters. Now that's the case where they tried to get a stalking order against Dale Walter and did not prevail. So they're attempting to embarrass Kimbrough by placing this large sign up in the public eye that says, you know, read this order of protection that doesn't exist. They lost that case, but they still reference it as if it existed. They, in fact, tried to enforce it later, and that motion was dismissed by Judge Bailey. They were saying, enforce this order that you entered. There was no order to enforce. The same with the sign. It was seeable from whoever might have been coming down the road or either Center Street or this lane. Mr. Eaker fired rifles off in his backyard, and this is right next to my client's yard. Was that illegal? I believe it would have been because I do believe this lane is in town. You know, was it talked about at trial? Was what talked about at trial? Whether there was a crime being committed when someone shot their gun. That was not brought up, but I do believe it. It's a very reckless disregard of other people's safety because you're in a, I won't say it's a subdivision, but there are houses around. If he misses or if a bullet ricochets at the distance, simply hit a nail on the backstop or whatever and go god only knows where. So I think there was just a reckless disregard for safety. Then there was also a, he contacted Amherst and had a utility pool put in his backyard with a parking lot style light in there which shone so brightly that my client had to put a comforter over her bedroom window just to try and sleep. Was that right? They wouldn't take it down. The police had been called on it at one point. Detroit police told him you need to turn that off. It's too bright. They complied that night, but the light was back later. Also, they placed a camera in their backyard which, while the eager say it was aimed at the gate, it's aimed directly at the house too because here's the gate, here's the house. So she was under constant surveillance from this camera as well. The armed police showing up to the property, the farm property, was just, while Kimber wasn't involved in it, personally I think any reasonable person would be alarmed by a load of cop cars coming up to the next door property with their weapons drawn. I mean you have no idea what's going on at that point. And she knows that these are the eagers that own this property. Who knows what is going on. William Eager, Scott Eager's father, admitted in his testimony at trial on this that he had been brandishing a shotgun. So if the police had not responded or there was a shootout of some kind, who knows, it could have easily shot into my client's house. How can that be attributed to stalking? You've got third parties having a fight. I'm not saying that that incident is stalking. I'm saying that that's what drove her after this long pattern of behaviors from Scott and Kathy Eager that she said I can't handle it anymore. I've got to do something. I'm not saying in any way that that incident was an example of stalking or harassing behavior to the order. I'm just saying that there was potential fallout from it that would have impacted her. Now, the Eagers would have us believe that none of this matters because no reasonable person would fear for their safety or suffer emotional distress from these behaviors. Most may say she might have suffered or justifiably felt mere concern. The notion that this long pattern of behavior going on and all you would get is mere concern is... Mr. Ellis, do you have your bottle? Thank you. Two points that I'd like to address. With regards to the firing of the rifle, I don't believe that it was within city limits. I don't believe that any crime was committed. Ms. Eager, I'm sorry, Ms. Carragher testified that no gun at any time had ever been pointed in her direction. The gun was not fired after an argument in anger. It wasn't fired to send a message. It wasn't fired as a threat. The firing of the gun is not in any way related to her in any way. For what reason? Scott Eagers, he's a sportsman. He likes guns. He's a hunter. I don't know that he had any... Certain birds or something? It might have been to test fire a new gun or something. I don't know the specific incident that it was related to because I don't believe that there was any communication between the parties at that time. With regards to the lock on the gate and it being superglued, that wouldn't have allowed the Eagers to come onto Ms. Carragher's property. It would have prevented anybody from using the gate to go on anybody else's property. So, again, we have a situation where it's the Eagers basically having some type of behavior that says, stay off my property, keep your distance. In regards to... I agree with both of them. Mr. Reams certainly has been amicable to this process, but his client sought the ex parte non-proton order, which essentially evicted my clients from their home. We did resolve that issue because of the manner in which it was obtained, and my clients did enter their home in order to maintain it, but they're still not there. They're still evicted from their home. Thank you. With regards to the utility pole and the camera, there was never any testimony that any of those things caused her fear or emotional distress. These were put up because someone had came onto the Eagers' property and had damaged some hoses that connected their pool, and they lost all the water in their swimming pool. And that's the point where they start putting up the no trespassing signs, they start putting up the lights and stuff. It is to keep people off their property. I'm not even sure the camera worked or that it was ever checked. The whole idea of the camera was not in regards to surveilling missing characters to keep, again, people off their property. And finally, in regards to the sign that said 11OP whatever needed, that was in reference to Mr. Walker. There was confusion from my clients. They thought that the order had been entered. And the reason is, and this is, again, the question I answered earlier, there was some dispute about Judge Bailey's ruling. Judge Bailey specifically announced from the bench, I find that he did exposure something. And then there's several pages where Judge Bailey said to Mr. Walters, do you think you can stay away from the Eagers? And he was saying yes, yes, yes. But he did that for some reason after he already announced he wasn't going to grant the petition. So, again, I think that this is just more evidence of neighbors just can't get along. But that's not salty. I mean, this is clearly not close to salty. So unless there's any other questions, I think that's it. Thank you. We'll take the matter under advisement.